UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:  RAKESH D. ANANDANI,          :          Case No. 16-10533REF

　　　　　Debtor          :          Chapter 7

-------------------------------------------

WYNN LAS VEGAS, LLC., GNLV Corp., :
and GOLDEN NUGGET ATLANTIC     :
CITY, LLC,          :          Adv. No. 16-224
　　　　　Plaintiffs          :
　　　　　vs.          :
RAKESH D. ANANDANI          :
　　　　　Defendant          :

# MEMORANDUM  OPINION

# I. INTRODUCTION

Plaintiffs, Wynn Las Vegas, LLC ("Wynn Las Vegas"), GNLV Corp.

d/b/a Golden Nugget Las Vegas ("Golden Nugget Las Vegas"), and Golden

Nugget Atlantic City, LLC d/b/a Golden Nugget Atlantic City ("Golden Nugget

Atlantic City"), filed an adversary complaint to determine that certain gambling

debts owed to them by Defendant, Rakesh D. Anandani ("Defendant"), should be

nondischargeable under 11 U.S.C. §§523(a)(2)(A) and (a)(6). I conducted the trial

in this dispute on March 20 & 21, 2017. At the beginning of the trial, counsel

reported that Wynn Las Vegas and Defendant had settled, the terms of which

1

settlement were not disclosed. Wynn Las Vegas therefore did not participate in the trial, leaving only Golden Nugget Las Vegas and Golden Nugget New Jersey as plaintiffs (together, "Plaintiffs") in the trial against Defendant.

At the conclusion of the trial, I took the matter under advisement and directed the parties to file briefs. The parties filed briefs in July 2017 and the matter is now ready for disposition.[1] Because Plaintiffs failed to meet their burdens of proof, the gambling debts owed to Plaintiffs are dischargeable under sections 523(a)(2)(A) and 523(a)(6). I will enter judgment in favor of Defendant and against Plaintiffs.

# II. **<u>FACTUAL BACKGROUND</u>**

Defendant applied for his first line of credit with Golden Nugget Atlantic City in September 2012. The line of credit was approved and Defendant used the credit to gamble at the Golden Nugget Atlantic City casino. Prior to August 2015, Defendant obtained advances on this line of credit to gamble at the Golden Nugget Atlantic City casino and he repaid each advance on time.[2]

---

[1]    The parties had originally filed briefs and reply briefs filed in or before June 2017. A squabble arose over the filing of briefs. To resolve the dispute, on June 29, 2017, I struck all briefs and directed both parties to file a single brief by July 21, 2017.

[2]    No evidence was presented to establish both (1) the number of times Defendant used his line of credit with Golden Nugget Atlantic City and (2) the total amount advanced and paid on this line of credit prior to this time before August 2015.

Defendant applied and was approved for his first line of credit from Golden Nugget Las Vegas in February 2015 after being approached and recruited by one of its representatives. Plaintiff was offered and accepted $10,000 in promotional chips to gamble at the casino. Between February 2015 and August 15, 2015, Defendant used this line of credit seven or eight times, each time borrowing $100,000, to gamble at the Golden Nugget Las Vegas casino. Defendant repaid each of the credit line advances on time.

On August 9, 2015, Defendant obtained an advance on his line of credit with Golden Nugget Atlantic City and was issued a marker in the amount of $100,000 to secure repayment of this advance. The marker was drawn on a joint bank account number 5720 owned by Defendant and his wife at Bank of America. Defendant used these funds to gamble at the Golden Nugget Atlantic City casino.

On August 15, 2015, Defendant obtained advances on his line of credit with Golden Nugget Las Vegas in the total amount of $250,000 and was issued three markers in the total amount of $250,000 to Golden Nugget Las Vegas to secure repayment of these advances. These markers were also drawn on bank account 5720. Defendant used these funds to gamble at the Golden Nugget Las Vegas casino.

At the time the markers were issued, insufficient funds existed in account 5720 to cover them, although sufficient funds to cover them existed in another Bank of America account, number 1608, jointly owned by Defendant and his wife. Before August 2015, Defendant would, at times, repay the amounts owed on markers with cash or gambling winnings as opposed to having the markers deposited by the casinos. In addition, Defendant was well versed in casino operations in the states of New Jersey and Nevada. Defendant knew that in New Jersey, markers in an amount over $5,000 would ordinarily not be deposited by the casino, or considered overdue, until the 45th day after the marker was issued. Defendant also knew that in Las Vegas, the markers would generally not be deposited, or considered overdue, until the 30th day after the markers were issued.

Prior to 2015, Defendant and his wife had argued for two or three years about his gambling habits. In June 2015, Mrs. Anandani separated from Defendant, although they remained living in the same home. When Defendant returned from his gambling trips in August 2015, he told his wife about his gambling losses and his desire to sell certain parcels of real estate they jointly owned to pay the gambling debts. Mrs. Anandani refused to allow the properties to be sold and advised Defendant that she was filing for divorce, which she did on August 20, 2015.

4

On August 21, 2015, Mrs. Anandani withdrew $325,000 from bank account 1608. She withdrew an additional $35,000 from account 1608 on August 26, 2015. Mrs. Anandani made both of these withdrawals without Defendant's knowledge. Mrs. Anandani withdrew these funds to prevent Defendant from using the funds to pay Plaintiffs the amounts owed on the outstanding lines of credit and to prevent Defendant from further gambling.

On August 28, 2015, Mrs. Anandani's divorce counsel filed a petition in the state court divorce proceeding to freeze the marital assets. The petition was granted by the state court judge overseeing the divorce proceeding on August 31, 2015.

In September 2015, a special master was appointed in the Anandani's divorce proceeding to determine equitable distribution of the Anandanis' marital assets and other issues. After a conference with the Anandanis' divorce counsel, the master sent a letter to counsel in the divorce proceeding dated October 16, 2015, which stated, in pertinent part:

> Under the circumstances, since a vast majority of the debt is gambling debt incurred by Husband, it shall be attributable to Husband alone. Therefore, the Master recommends a framework wherein Wife will receive the vast majority of all the assets. A reasonable framework would be that Husband keeps perhaps one or two properties and perhaps a nominal sum of money and a vehicle with Wife receiving the remainder of

the assets. In addition, Husband would be responsible for the gambling debt in his name alone.

<u>See</u> Exhibit P-11, p.1.

The master rendered his final decision in a letter dated December 10, 2015 addressed to the Anandani's divorce counsel. The decision awarded the vast majority of marital assets to Mrs. Anandani and made Defendant solely responsible for all gambling debt due to "extensive dissipation of the marital assets as a result of [Defendant's] gambling losses which were unknown to Wife…." <u>See</u> Exhibit P-12, pp. 1-3. The state court judge made the December 10 letter an Order of Court on January 15, 2016. <u>See</u> Exhibit P-12, p.4.

Through Fall 2015, Defendant believed he would be able to pay Plaintiffs the amounts owed on the markers by selling property he owned jointly with his wife, from assets he would receive in the divorce proceeding, or from funds he could obtain from friends and relatives. His wife, however, refused to allow the sale of the jointly held property. After the master issued his recommendation, it was apparent to Defendant that he could not depend on his divorce settlement to pay the markers owed to Plaintiffs. He soon thereafter learned that friends and relatives would no longer provide him with funds to pay his gambling debts because they all decided that "enough is enough."  Notes of Testimony ("N.T."), March 21, 2017 trial, at p. 104, line 8.

By December 2015 or January 2016, Defendant realized that he would not be able to pay Plaintiffs the amounts owed on the markers from the sale of property, from marital assets, or from friends or family. N.T. March April 21, 2017 trial, p. 76, lines 23-25 –p. 77, lines 1-4. Nonetheless, Defendant continued to assure Plaintiffs' representatives that he would pay Plaintiffs the amounts outstanding when his divorce was concluded and his assets were "unfrozen." He made these promises because he was afraid Golden Nuggets Las Vegas would file criminal charges against him if he did not make good on the markers. Id. at p.77, lines 5-8. As a result, Plaintiffs delayed collecting on the markers, which remain unpaid to date.

On January 15, 2016, the Anandanis' divorce decree was entered.

On January 27, 2016, Golden Nugget Las Vegas sent Defendant a notice stating that if his outstanding balance was not reconciled in ten days, his account would be referred to the Clark County, Nevada District Attorney for criminal prosecution.

On that same date, January 27, 2016, Defendant filed his chapter 7 petition.

# III. **DISCUSSION**

## A. **General Dischargeability Standard.**

In keeping with "[t]he overriding purpose of the Bankruptcy Code, [which] is to relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start," Insurance Co. of North America v. Cohn (In re Cohn), 54 F.3d 1108, 1113 (3d Cir. 1995), "[e]xceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors." Id. In any dischargeability proceeding under sections 523(a)(2) or (a)(6), the creditor bears the burden of proving that the debt is nondischargeable by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991).

## B. **Dischargeability Under Section 523(a)(2)(A).**

A debt for "money, property, services, or an extension, renewal, or refinancing of credit," is nondischargeable under section 523(a)(2)(A) if it is obtained by "false pretenses, a false representation, or actual fraud."

To prevail on a complaint under section 523(a)(2)(A), Plaintiffs have the burden of proving, by a preponderance of the evidence: (1) Defendant made a material representation of fact that he knew at the time was false; (2) Defendant made the representation with the intention and purpose of deceiving Plaintiffs; (3)

8

Plaintiffs justifiably relied on the representation; and (4) Plaintiffs suffered loss or damages as a proximate cause of the false representation. Strominger v. Giquinto (In re Giquinto), 388 B.R. 152, 165 (Bankr. E.D. Pa. 2008). As we are reminded by Chief Judge Eric Frank in Giquinto:

> Intent is a required element of § 523(a)(2)(A). See, e.g., In re Ojeda, 2008 WL 1883221, at *11 (Bankr. N.D. Ill. Apr. 22, 2008) ("[a]ny cause of action under § 523(a)(2)(A)—false pretenses, false representation, or actual fraud—requires proof that the debtor acted with intent to deceive"). Determining whether a debtor had the requisite fraudulent intent to warrant an exception to discharge is a subjective inquiry. Field v. Mans, 516 U.S. 59, 70–72, 116 S. Ct. 437, 444, 133 L. Ed. 2d 351 (1995).

Id. "Central to the concept of fraud is the existence of scienter which, for purposes of § 523(a)(2)(A), requires that it be shown that at the time the debt was incurred [or the promise was made], there existed no intent on the part of the debtor to repay the obligation." Caro v. Jundi (In re Jundi), Bankr. No. 11–14496, Adv. No. 11–0759, 2012 WL 3648013, at *5 (Bankr. E.D. Pa. Aug. 23, 2012)(citation omitted)).

Plaintiffs  argue that the debts owed to them by Defendant are nondischargeable under section 523(a)(2)(A) because Defendant fraudulently induced Plaintiffs to forbear from collecting on the markers by repeatedly requesting extensions of the payment due date with false

promises of payment and by advising Plaintiffs that he would have the funds when his divorce was finalized.

It is well established that evidence of a broken promise to pay a debt, without more, will not satisfy a creditor's burden of proof under section 523(a)(2)(A). Otherwise, every debt based on breach of contract would be rendered nondischargeable. Giquinto, 388 B.R. at 166. Instead, section 523(a)(2)(A) requires that the creditor show the existence of scienter, which means that the creditor must establish that at the time the debt was incurred, or the promise was made, there existed no intent on the part of the debtor to repay the obligation. Jundi, 2012 WL 3648013, at *5; EDM Machine Sales, Inc. v. Harrison (In re Harrison), 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003). Determining whether a debtor had the requisite fraudulent intent involves a subjective inquiry. Giquinto, 388 B.R. at 165.

Defendant had a history of using markers to gamble at the casinos at both the Golden Nugget Atlantic City and the Golden Nugget Las Vegas. Defendant had always paid the amounts owed on the markers to both Plaintiffs in a timely fashion. I find, based on Defendant's credible testimony, that he honestly believed, in August 2015 until December 2015 or January 2016, that he would be able to pay the amounts he owed to Plaintiffs on the markers either by selling property he owned jointly with his wife,

from funds that were available to him in a bank account he owned jointly

with his wife, from assets he might receive in the divorce proceeding, or

from funds he might receive from friends or relatives.

As Judge Fox explained in a case involving a casino's attempt

to have a gambling debt found nondischargeable, "[s]uch a belief may have

defied the odds, … however, this belief <u>does</u> <u>not</u> support [the casino's]

conclusion that [debtor] never intended … to repay [the debt] … ." <u>Adamar</u>

<u>of New Jersey, Inc. v. August</u> (<u>In re August</u>), 448 B.R. 331, 355 (Bankr.

E.D. Pa. 2011)(emphasis in original). <u>See also</u> <u>Boyd Gaming Corp. v. Hall</u>

(<u>In re Hall</u>), 228 B.R. 483, 490 (Bankr. M.D. Ga. 1998)("So long as the

debtor has an honest, even if unreasonable, belief that he will get lucky …

and pay off his debts then this Court is satisfied that the debtor has the

requisite intent to repay.").

During the time frame of December 2015 into January 2016,

Defendant conceded that he realized that he would not be able to

immediately pay Plaintiffs the amounts owed on the markers, N.T. March

21, 2017 trial, p. 76, lines 23-25 –p. 77, lines 1-4. I find, however, that

Defendant continued to intend to pay Plaintiffs the amount owed on the

markers. Defendant credibly testified that he had every "intention to repay

the markers as always," N.T. March 21, 2017 trial, p.95, lines 3-6. Debtor

made the requests for extensions and promises to pay because he was afraid

of criminal prosecution before he could pay the casinos. N.T. March 21,

2017 trial, p. 105, lines 18-21.

A creditor can rely upon circumstantial evidence to establish a

debtor's intent to deceive, U.S. Sec. & Exch. Comm'n v. Bocchino (In re

Bocchino), 794 F.3d 376, 382 (3d Cir. 2015). But I find that Plaintiffs failed

to meet their burden of establishing sufficient evidence of any nature to

prove that Defendant never intended to repay the debts he owed them. Jundi,

2012 WL 3648013, at *5.

This case turns on whether Defendant had no intention of ever

repaying Plaintiffs when he made the promises to repay the amounts owed

on the markers. It is rarely possible to conclusively ascertain a debtor's

subjective state of mind in a section 523(a)(2)(A) adversary proceeding.

"[T]he court usually must assess the Debtor's credibility against the weight

of the evidence offered against him, relying largely on experience and

human intuition." Oppenheimer & Co., Inc. v.  Ricker (In re Ricker), 475

B.R. 445, 457-58 (Bankr. E.D. Pa. 2012); see also Chase Bank USA v.

Ritter (In re Ritter), 404 B.R. 811, 827 (Bankr. E.D. Pa. 2009)("The central

fact issue in this case, the Debtor's subjective state of mind, is ultimately

unknowable with certainty. At some point in the deliberative process in a

case (like this one) that turns on a party's scienter, the factfinder must draw upon his or her experience and intuition to make a judgment regarding the likely motivations underlying the party's conduct.").

The burden of proof falls on Plaintiffs to show, by a preponderance of the evidence, that Defendant not only made the representations knowing they were false, but also that he made them with the intention of never repaying Plaintiffs. Jundi, 2012 WL 3648013, at *5; Giquinto, 388 B.R. at 165. Plaintiffs failed to meet this burden. Defendant's credible testimony establishes that until late in 2015, Defendant had an honest belief that he would be able to soon pay Plaintiffs the amount owed on the markers, just as he had in the past. By December, 2015 and January, 2016, Defendant was forced to face the fact that neither the distribution he received in his divorce proceeding nor friends and relatives could provide funds to repay Plaintiffs the amounts he owed them.

But Defendant's credible testimony established that he continued to promise to repay Plaintiffs the amounts owed on the markers because he was afraid of criminal prosecution, not because he never intended to repay Plaintiffs. At best, this evidence shows that Defendant realized he might not be able to repay Plaintiffs when he made the promises

13

to pay, but it does not establish that he made the promises without intending
to ever repay the debt.

But if Plaintiffs proved that Defendant promised to repay the
markers while intending to never repay them, which I specifically find they
have not, I would nonetheless rule in favor of Defendant and find the debts
dischargeable under section 523(a)(2)(A). Plaintiffs failed to prove, by a
preponderance of the evidence, that they suffered losses or damages as a
proximate result of Defendant's promises.

As stated earlier, for Plaintiffs to prevail under section
523(a)(2)(A) they must demonstrate that the creditor suffered a loss or
damage as a proximate consequence of the representation having been made.
August, 448 B.R. at 349 (emphasis supplied); see also Giquinto, 388 B.R. at
165.

The evidence establishes that the damages claimed by
Plaintiffs, i.e., the debts owed on the markers, arose as a result of Plaintiffs'
decisions in August 2015 to extend credit to Defendant to enable him to
gamble at their casinos. These debts did not arise from Defendant's
subsequent promises of repayment.

In addition, Plaintiffs failed to establish, by a preponderance of
the evidence, that they would have successfully collected on the debts had

14

they not delayed their collection efforts as a result of Defendant's promises of repayment. To the contrary, Defendant filed this chapter 7 bankruptcy petition immediately after Golden Nugget Las Vegas initiated its collection efforts. Debtor filed his chapter 7 petition the same day Golden Nugget Las Vegas sent him the ten-day notice (required by Nevada state law) of its intention to collect on the debt and refer the matter to the Clark County, Nevada, District Attorney for criminal prosecution.

Golden Nugget Las Vegas was obliged by Nevada state law to provide this ten-day notice. Any earlier attempt it might have made to collect on the debt would also have required the ten-day notice and would also have been met with Defendant's immediate chapter 7 bankruptcy filing. See N.T., March 21, 2017 trial, p. 77, lines 9-20. Plaintiffs would have faced a bankruptcy filing by Defendant, and the concomitant discharge of the debts owed to them, even if they had not delayed their collection efforts. As a result, I find that Plaintiffs failed to prove by a preponderance of the evidence that they suffered losses or damages as a proximate result of Defendant's statements in December 2015 and January 2016. Plaintiffs would have suffered identical losses or damages if they had not delayed their collection efforts.

Plaintiffs failed to meet their burden of proving that (1)

Defendant made the subsequent promises of repayment with intent to

deceive and (2) they did not suffer losses or damages as a proximate result

of Defendant's subsequent repayment promises. I therefore find and

conclude that Plaintiffs failed to meet their burden of proving that the debts

owed by Defendant are nondischargeable under section 523(a)(2)(A).[3] I will

enter judgment in favor of Defendant and against Plaintiffs on the section

523(a)(2)(A) cause of action.

## C.  <u>Dischargeability Under Section 523(a)(6).</u>

Section 523(a)(6) renders a debt based on a willful and malicious

injury by the debtor to another entity nondischargeable. 11 U.S.C. §523(a)(6).

> "Willful" and "malicious" are distinct elements. (citations
> omitted).
>
> The term "willful" refers to a deliberate or intentional injury,
> not just a deliberate or intentional act that leads to injury. <u>E.g.</u>,
> <u>Coley</u>, 433 B.R. at 497 (citing <u>Kawaauhau v. Geiger</u>, 523 U.S.
> 57, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998)). The plaintiff must
> establish that the debtor "purposefully inflict[ed] the injury or
> act[ed] in such a manner that he is substantially certain that
> injury will result." <u>In re Singer</u>, 2010 WL 3732944, at *5

---

[3]    Because I find that Plaintiffs failed to establish crucial elements of their section
523(a)(2)(A) cause of action, I need not reach the other issue raised by the parties, which is
whether a creditor's forbearance from collection activities constitutes an "extension of credit"
under section 523(a)(2)(A).

(D.N.J. Sept. 17, 2010) (citing In re Conte, 33 F.3d 303, 305 (3d Cir. 1994)).

In Conte, the Third Circuit did not expressly resolve an important issue: whether the "substantial certainty of producing injury" standard is measured objectively (i.e., whether there was an objective, substantial certainty of the injury resulting as a consequence of the debtor's deliberate action, that would have been known by a reasonable person) or whether it is measured subjectively (i.e., the debtor was aware that the injury was a substantially certain consequence of the deliberate conduct). (citation omitted).

Most of the courts in this Circuit that have considered the issue have held that Conte mandates application of the subjective standard. See In re Adalian, 481 B.R. 290, 292 (Bankr. M.D. Pa. 2012); In re Glenn, 470 B.R. 731, 736 (Bankr. M.D. Pa. 2012); In re Benun, 386 B.R. 59, 77 (Bankr. D.N.J. 2008); see also August, 448 B.R. at 358 (quoting In re Su, 290 F.3d 1140, 1144 (9th Cir. 2002)) (§ 523(a)(6) renders a debt nondischargeable "when there is either a subjective intent to harm, or a subjective belief that harm was substantially certain"). But see In re Reath, 368 B.R. 415, 426 (Bankr. D.N.J. 2006) (dictum); In re Conner, 302 B.R. 509, 515 n. 4 (Bankr. W.D. Pa. 2003) (dictum).

"Malice" refers to actions that are wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will. 4 Collier on Bankruptcy ¶ 523.12[2] (Alan N. Resnick, Henry J. Sommer eds., 16th ed. 2009).

Malice does not mean the same thing for nondischargeability purposes under § 523(a)(6) as it does in contexts outside of bankruptcy. In bankruptcy, debtor may act with malice without bearing any subjective ill will toward plaintiff creditor or any specific intent to injure same.

In re Wooten, 423 B.R. 108, 130 (Bankr. E.D. Va. 2010) (citation omitted) (emphasis added); see also In re Vidal, 2012 WL 3907847, at *28 (Bankr. E.D. Pa. Sept. 7, 2012).

Southeastern Pennsylvania Synod of the Evangelical Lutheran Church of
America v. Gotwald (In re Gotwald), 488 B.R. 854, 865-66 (Bankr. E.D. Pa.
2013). "The debtor's scienter is critical in making the determination of
willfulness. In this Circuit, the consensus among the bankruptcy courts is
that a debtor must be subjectively aware that his or her actions are
substantially certain to cause a [sic] injury to satisfy this standard." J & V
Developers, Inc. v. Malloy (In re Malloy), 535 B.R. 81, 93 (Bankr. E.D. Pa.
2015).

Thus, to be successful on the section 523(a)(6) claim, Plaintiffs must
establish that that the debt arose from an injury to the Plaintiffs that was "(1)
willful (i.e., involving deliberate and intentional conduct); (2) intended or
substantially certain to cause injury; and (3) malicious (i.e., wrongful)." Beard
Research, Inc. v. Kates (In re Kates), 485 B.R. 86, 101 (Bankr. E.D. Pa. 2012).
Furthermore, as with all exceptions to the debtor's discharge, the creditor bears the
burden of proving all elements of section 523(a)(6) by a preponderance of the
evidence. Grogan, 498 U.S. at 291.

Plaintiffs argue that the debts owed to them should be
nondischargeable under section 523(a)(6) because Defendant knew his
actions were substantially certain to cause them injury. Plaintiffs, however,
failed to prove this. Plaintiffs concede that a subjective standard applies to

18

section 523(a)(6). They failed, however, to prove that Defendant purposely

inflicted an injury on them or that he actually knew his actions were

substantially certain to cause them injury. Defendant credibly testified that

he continued to promise to repay to Plaintiffs even after he knew he would

be unable to use any equitable distribution award or funds from friends or

relatives to fund the repayments because (1) he always intended to pay the

debt and (2) he was afraid of criminal prosecution by Golden Nugget Las

Vegas. This does not establish that Defendant purposely inflicted an injury

on Plaintiffs or that he actually knew his continued promises were

substantially certain to cause Plaintiffs harm. Plaintiffs failed to produce any

evidence that might establish these facts.

Plaintiffs presented insufficient evidence to establish that

Defendant purposely inflicted an injury on them or that he knew his actions

were substantially certain to cause them injury. They also failed to prove that

the debts arose from some willful and malicious conduct by Defendant.

Kates, 485 B.R. at 101; see also Nakonetschny v. Rezykowski (In re

Rezykowski), 493 B.R. 713, 728 (Bankr. E.D. Pa. 2013).

Moreover, even if Plaintiffs had presented sufficient evidence

to establish that Defendant purposely inflicted an injury on them or that he

knew his actions were substantially certain to cause them injury, which I

19

specifically find they have not, they would still have to prove that the debts

arose from Defendant's willful and malicious conduct. Kates, 485 B.R. at

101; see also Nakonetschny v. Rezykowski (In re Rezykowski), 493 B.R.

713, 728 (Bankr. E.D. Pa. 2013). Plaintiffs failed to prove this.

Plaintiffs seek to have the debts owed to them on the markers

found nondischargeable under section 523(a)(6). The debts arose from

Plaintiffs' original decisions in August 2015 to extend credit to Defendant,

not from Defendant's later promises of repayment of those debts.

Furthermore, as I described in my discussion of the damages requirement

under section 523(a)(2)(A), supra at pages 14-16, Plaintiffs failed to prove

how Defendant's later promises of repayment injured them. As I also stated

earlier, had Plaintiffs not delayed their collection efforts based on

Defendant's subsequent promises of payment, they would have faced an

earlier bankruptcy with its concomitant discharge of the debts they are owed.

As soon as Golden Nuggets Las Vegas served Defendant with the ten-day

notice of intent to collect required by Nevada state law, he would have filed.

Defendant's subsequent promises of repayment and Plaintiffs'

decision to delay collection efforts did not alter the end result of discharge of

the debt. The result would have been the same if Defendant had never made

the subsequent promises of repayment and if Plaintiffs had not delayed their

collection efforts. Golden Nugget Las Vegas would have provided

Defendant with the ten-day notice at an earlier date, which would have led

Defendant to file his chapter 7 bankruptcy petition at an earlier date. See

N.T., March 21, 2017 trial, p. 77, lines 9-20. The result would have been

identical – Plaintiffs would face discharge of the debts they are owed by

Defendant due to his filing of a chapter 7 bankruptcy petition at an earlier

date.

      For all of these reasons, I find and conclude that Plaintiffs failed to

establish that Defendant's gambling debt arose as a result of his willful and

malicious conduct. The debts are therefore also dischargeable under section

523(a)(6) and I will enter judgment in favor of Defendant and against Plaintiffs on

the section 523(a)(6) cause of action.

# IV.  <u>CONCLUSION</u>

For the reasons set forth above, I find and conclude that Plaintiffs failed to meet their burden of proving that the debts owed to them by Defendant are nondischargeable under either section 523(a)(2)(A) or section 523(a)(6). The debts are therefore dischargeable and I will enter judgment on the complaint in favor of Defendant and against Plaintiffs.

An appropriate Order follows.

DATE:  September 11, 2017                    BY THE COURT

_____
RICHARD E. FEHLING
United States Bankruptcy Judge